IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DONALD C. O'HERN (AIS #191045),   )
 )
     Plaintiff,   )
 )
   v.   ) CASE NO. 2:12-CV-00697-WHA
 )         [WO]
DALLAS DIAZ, et al.,   )
 )
     Defendants.   )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This matter is before the court on a 42 U.S.C. § 1983 action filed by Plaintiff, Donald

C. O'Hern, an inmate currently housed at the Kilby Correctional Facility ("Kilby") in Mt.

Meigs, Alabama. In addition, a liberal construction of the plaintiff's complaint discloses that

he brings a medical malpractice claim premised on state law.  O'Hern challenges the medical

treatment provided to him during his incarceration at Kilby. *Compl. - Doc. No. 1*; *Am. Compl.

- Doc. No. 5.* The defendants named to this action are Dallas Diaz, Sangeeta Doshi, and

Corizon Inc. *See Order of Oct. 10, 2012, Doc. No. 17* (allowing substitution of names for

previously named defendants D. Diaz, Dr. Dozier, and Corizon Medical Services). O'Hern

seeks injunctive relief and money damages.  *Compl. - Doc. No. 1 at 4*; *Am. Compl. - Doc. No.

5 at 4.*

Pursuant to the orders of this court, defendants filed an answer, special report,

supplemental report, and supporting evidentiary materials addressing the claims for relief

raised in the complaint. *Doc. Nos. 8, 15, 29, 38.* In their report, defendants deny they violated

O'Hern's Eighth Amendment rights. Defendants further assert O'Hern fails to state a claim against them for malpractice under Alabama state law. *Defs.' Reports - Doc. Nos. 15*.

Pursuant to the orders entered in this case and governing case law, the court deems it appropriate to treat the defendants' reports as a motion for summary judgment. *Order of Oct. 9, 2012*. Thus, this case is now pending on the defendants' motion for summary judgment. Upon consideration of this motion and the evidentiary materials filed in support thereof, the court concludes that the defendants' motion for summary judgment is due to be granted.

## I.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former Fed. R. Civ. P. 56 omitted); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]

---

[1]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes. Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

The Defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to Murphy to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to the case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a

---

remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive the Defendants' properly supported motions for summary judgment, Murphy is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e).  "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment"); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate "produced nothing, beyond his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*,

4

739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of party's own conclusory allegations is not sufficient to oppose a motion for summary judgment. . . .").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004).  What is material is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing

5

summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact.  *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, a plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, O'Hern fails to demonstrate a requisite genuine dispute of material so as to preclude summary judgment on all of his claims against the defendants.  *Matsushita*, 475 U.S. at 587.

## II. SUMMARY OF MATERIAL FACTS

Plaintiff Donald C. O'Hern is an inmate of the Alabama Department of Corrections (ADOC) and is incarcerated at Kilby. *Compl. - Doc. No. 1*; *Defs.' Supp*. Defendant Corizon has a contract with the ADOC to provide medical care and services to inmates. *Doshi Aff. ¶ 4 - Doc. No. 15-1* at 2. Defendant Sangeeta A. Doshi is a medical doctor who worked as an independent consultant for Corizon and was the medical director at Kilby in 2012. *Doshi Aff. ¶¶ 3-4 - Doc. No. 15-1* at 2. It is unclear from the record when Doshi left Kilby, but she no longer works there, and as of 2014, Dr. Wilcotte Rahming, who is Board Certified in Gastro-Intestinal Medicine and Internal Medicine, is the medical director at Kilby. *Rahming Aff. - Doc. No. 38-1* at 2-3. Defendant Dallas Diaz, R.N., was a nurse for Corizon in 2012, but she is no longer an employee. *Defs.' Suppl. Special Report - Doc. No. 38* at 1.

The affidavits filed by defendants and the most recent medical director at Kilby address the allegations made by O'Hern.  A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with treatment provided to O'Hern regarding his claim of deliberate indifference. *Doshi Aff. - Doc. No. 15-1*; *Medial Exs. - Doc. Nos. 15-1 through 15-5, Diaz Aff. - Doc. No. 15-6; Medical Exs. - Doc. Nos. 15-7 through 15-8*; *Doshi Suppl. Aff. - Doc. No. 29-1*; *Rahming Aff. - Doc. No. 38-1*; *Suppl. Medical Exs. - Doc. Nos. 38-2, 38-3.* O'Hern has a long history of a hip ailment that predates his incarceration. In 1995,

before he was incarcerated, O'Hern saw Morton S. Rickles, M.D., in Anniston, Alabama, regarding right hip pain. *Rahming Aff. - Doc. No. 38-1* at 3-4. O'Hern broke his femur and his hip in a motorcycle accident in 1983 and underwent surgery for them in 1985. *Doshi Suppl. Aff. - Doc. No. 29-1* at 3; *Rahming Aff. - Doc. No. 38-1* at 3. Rickles reported that O'Hern had been taking 800 mg Ibuprofen three times a day for several years, but he had burning in his esophageal area and low back pain when he took the Ibuprofen. *Rahming Aff. - Doc. No. 38-1* at 3. Rickles observed that O'Hern walked with antalgic gait; he had limited range of motion in his right hip, and his right leg was shorter than his left leg. *Id.* Rickles assessed O'Hern with traumatic degenerative arthritis, loss of normal angulation neck of the femur, and "in danger if he is not already to develop complications from Ibuprofen, specifically gastritis and renal problems." *Id.* at 4. Rickles recommended stopping all medication and consulting with a urologist and gastroenterologist *Id.*

About a month later in 1995, O'Hern saw Kenneth Vandervoort, M.D., at Anniston Orthopaedic Associates. *Id.* Dr. Vandervoort evaluated O'Hern for avascular necrosis of O'Hern's right hip. They discussed the pro and cons as well as risks and benefits of hip replacement surgery. Dr. Vandervoort recommended O'Hern delay surgery as long as possible, and Dr. Vandervoort planned to check back in six months to a year, unless O'Hern recontacted the office sooner for surgery. *Id.* Dr. Rahming explained that avascular necrosis involves death of bone components, and avascular necrosis of a joint, as in O'Hern's case, "can often lead to destruction of the joint articular surfaces." *Id.* The extent of disability from

avascular necrosis depends on several factors, but it causes bone collapse, slow healing, pain, and arthritis. *Id.* at 4-5. According to Dr. Rahming, O'Hern's avascular necrosis went relatively untreated for almost 15 years, until his incarceration, and it led to "severe deterioration of Mr. O'Hern's hip." *Id.* at 5.

On April 1, 1997, after O'Hern entered the ADOC, x-rays were taken of his hip. *Id.* The report regarding the x-ray stated, "There are severe degenerative changes involving the hip and acetabulum with changes involving the femoral head. This may represent avascular necrosis." *Id.* Seven years later, in May 2004, O'Hern was prescribed Percogesic for pain relief related to "[a]vascular necrosis of his femoral head with mild to moderate osteoarthritic change within the hip joint. Varus deformity of the femoral neck is noted as described above." *Id.* at 5-6. The prison health services ordered an orthopedic consult which occurred on June 9, 2004, with Tai Chung, M.D. *Id.* at 6. Dr. Chung's notes state O'Hern had "[r]ight hip arthritis, status post avascular necrosis of the right femoral head in a 49 year old gentleman." *Id.* Dr. Chung stated:

> Discuss options with him. At this time, the only true surgical solution would be a total hip replacement. Given his young age, and his overall environment, I think it probably is not ideal to do the operation at this time. I think we should wait until he is over 55 and out of his present situation. In the meantime, we can manage his symptoms with anti-inflammatory medication and use of a cane. See me as needed.

*Id.* From 2004 to 2008, O'Hern was variously prescribed Naprosyn, Naprosyn with antacid, Percogesic, Feldene, and Zantac. *Id.* at 6-7.

In April 2008, x-rays were taken of O'Hern's hips. *Id.* at 8. The report regarding the

x-rays state O'Hern had arthritis and bursitis of the right hip, and the findings state:

> There is hypertrophic change of the femoral head and acetabulum with some interspace narrowing of the joint space but there is no evidence of any acute trauma. . . . However, a non-displaced fracture can be hidden by bursitis and arthritis and if the patient had a legitimate documentation of falling or if the pain persists I would suggest you take the patient to the hospital for CT scan.

*Id.* In August 2008, special shoes were ordered for O'Hern because his right leg was 4 inches shorter than his left leg. *Id.*

In February 2010, nurse practitioner Marianne Baker treated O'Hern for a muscle strain in his left thigh related to compensation for his right leg, and she noted he was ambulating very slowly and cautiously. *Id.* In August 2010, Baker noted that O'Hern's hip hurt worse when he rolled over during sleep, and he had chronic pain that was treated with medication. *Id.* at 8-9. In October 2010, Baker noted O'Hern was ambulating with a cane and a limp, and he could move his extremities. *Id.* at 9.

In March and April 2011, O'Hern was referred for orthotic shoes to offset the discrepancy in his legs, and he received them in May 2011. *Id.* In October 2011, O'Hern saw Baker after O'Hern lost his Keep On Person medication privileges for lack of compliance. *Id.* O'Hern said walking to pill call worsened his pain. *Id.* He was advised to continue his current medications. *Id.*

On October 20, 2011,[2] O'Hern had x-rays of his right hip. *Rahming Aff. - Doc. No.*

---

[2]Rahming's affidavit states the x-ray occurred on October 20, 2012, but the medical records state it occurred in 2011. *Compare Rahming Aff. - Doc. No. 38-1* at 10 *and Defs.' App. - Doc. No. 15-8* at 9.

*38-1* at 10; *Defs.' App. - Doc. No. 15-8* at 9. According to the radiologist's report:

> The right hip is in alignment, but there is narrowing of the joint space due to margin degenerative changes. Chronic flattening and remodeling of the femoral head. A remote healed subcapital fracture could have a similar appearance. There is marked degenerative spurring involving acetabular border and femoral head and neck junction. No fracture or dislocation is seen. Pubic rami are intact.

*Defs.' App. - Doc. No. 15-8* at 9. The conclusion was "[m]arked osteoarthritis of the right hip with chronic flattening and remodeling of the femoral head. Clinical or repeat examination follow-up is advised." *Id.*

About a month later, on November 23, 2011, O'Hern complained that his hip pain was not responding to current medications, and his medical provider consulted with Defendant Dr. Doshi. *Rahming Aff. - Doc. No. 38-1* at 9-10. Doshi and the medical providers added Ultram to O'Hern's medications "for better pain management." *Id.* at 9. O'Hern was continued on his profiles for orthotic shoes and a cane. *Id.*

On January 5, 2012, Doshi saw O'Hern and ordered him a longer cane. *Id.* On January 18, 2012, O'Hern filed a grievance, stating he needed to see an orthopedic doctor and a hip replacement. *Defs.' App. - Doc. No. 15-6* at 5. Defendant Diaz responded, stating O'Hern was seen for his hip on November 23, 2011; he was scheduled to see a physician; and the physician would determine whether O'Hern would be referred to a specialist. *Id.* On January 25, 2012, O'Hern told health services that he received some pain relief with daily use of Ultram, and he obtained a refill of Ultram. *Rahming Aff. - Doc. No. 38-1* at 11. O'Hern said his orthotic shoe needed to be higher, and that same day Doshi ordered a consult for an

orthotic shoe. *Id.*

On February 1, 2012, Doshi saw O'Hern and referred him to Orthotics. *Id.* at 10. On February 2, 2012, after O'Hern returned from his consult, Doshi noted that O'Hern would get corrected shoes. *Defs.' App. - Doc. No. 38-2* at 40. On February 6, 2012, O'Hern received his longer cane. *Rahming Aff. - Doc. No. 38-1* at 10. On February 22, 2012,[3] O'Hern was noted to be ambulating with a cane and orthotic shoe, and performing activities of daily living without assistance. *Defs.' App. - Doc. No. 15-7* at 55; *Rahming Aff. - Doc. No. 38-1* at 11.

On February 23, 2012, Doshi completed a consultation request for an orthopedic evaluation with Dr. Chung for hip replacement. *Defs.' App. - Doc. No. 15-8* at 15. The medical notes include a notation for February 27, 2012, under the Alternative Treatment Plan, stating "ATP: Manage on site. HHood MD." *Id.*

On March 9, 2012, Nurse Practitioner Baker saw O'Hern, and the plan was to renew O'Hern's medications and check on his shoe repair. *Defs.' App. - Doc. No. 15-7* at 52. On March 22, 2012,[4] Baker again saw O'Hern, and she planned to renew his Ultram, continue his medications for pain, and check on his shoe replacement. *Id.* at 52-53; *Rahming Aff. -*

---

[3]Rahming identifies this date as December 22, 2012, *Rahming Aff. - Doc. No. 38-1* at 11, which must be in error because the same document was submitted to the court on October 5, 2012, *Defs.' App. - Doc. No. 15-7* at 55. In the earlier document, the date appears to be February 22, 2012.

[4]Rahming identifies this date as March 2, 2012, *Rahming Aff. - Doc. No. 38-1* at 11, which the court treats as a scrivener's error.

*Doc. No. 38-1* at 11.

In May 2012, medical care providers again noted to check on O'Hern's shoe replacement. *Defs.' App. - Doc. No. 15-7* at 50, 74-74.

On June 19, 2012, O'Hern submitted a medical grievance stating Doshi told O'Hern his hip would be taken care of "in house" and asking what that meant. *Defs.' App. - Doc. No. 15-6* at 6. O'Hern stated he was in dire need of a hip replacement, and he also needed a new shoe. *Id.* Diaz responded on June 22, 2012, that Corizon would continue to manage O'Hern's hip, that it was not determined that surgery was necessary, that if O'Hern's condition worsened the providers would assess and take appropriate action, and that O'Hern was scheduled to assess his need for a thicker-soled shoe. *Id.* On June 24, 2012, O'Hern appealed. *Id.* at 7. Diaz responded on July 13, 2012, that Corizon medical care providers would continue to manage his hip problem, and that he would receive a new shoe. *Id.*

On July 5, 2012, a nurse saw O'Hern for a follow-up about his orthotic shoes. *Defs.' App. - Doc. No. 15-7* at 71.

O'Hern filed this lawsuit in mid-August 2012. *Compl. - Doc. No. 1.* He complained that his hip joint was deteriorating and his leg continues to get shorter by .75 inches each year as the result of his hip ailment, causing him pain and the threat of severing an artery, and only a complete hip replacement will cure him, but defendants refuse to refer him to an orthopedic specialist. *Compl. - Doc. No. 1* at 3; *Am. Compl. - Doc. No. 5* at 2-3. O'Hern complained that the lift in his shoe is not enough to compensate for the difference in his leg lengths, causing

13

him poor balance. *Compl. - Doc. No. 1* at 3. O'Hern states he fell, causing tears in his arm and shoulder muscles, and he lives in constant fear of falling. *Compl. - Doc. No. 1* at 3; *Am. Compl. - Doc. No. 5* at 3. Since the time he filed his complaint, O'Hern has received additional medical care.

On August 22, 2012, O'Hern told medical care providers that he received good response with Ultram for about four to five hours and requested an increase in dosing, which was ordered. *Rahming Aff. - Doc. No. 38-1* at 11.

On October 30, 2012, Doshi prescribed use of a wheelchair to avoid weight bearing for one year as well as more Ultram. *Id.* at 12. On November 16, 2012, O'Hern was seen in health services for complaints of pain and replacement of his specialty shoe, and the nurse planned, among other things, to consult Dr. Doshi. *Defs.' App. - Doc. No. 38-2* at 51. On December 12, 2012, after a consult with Doshi, O'Hern's Ultram was increased. *Id.* at 52. It was noted that he was using his cane rather than his wheelchair and that O'Hern said the wheelchair caused him more pain than the cane. *Rahming Aff. - Doc. No. 38-1* at 12. On December 20, 2012, Doshi agreed to request new orthotic shoes for O'Hern. *Defs.' App. - Doc. No. 38-2* at 54. O'Hern received a consult for new shoes on January 2, 2013. *Rahming Aff. - Doc. No. 38-1* at 12.

In 2013, O'Hern was treated for chest pain. *Id.* His profiles for a cane, egg crate mattress, and medications were continued, and in 2014 he was refitted for his orthotic shoe. *Id.* at 12-13.

14

In 2014, Dr. Rahming reduced O'Hern's Ultram prescription and observed that O'Hern was ambulating satisfactorily with his cane. *Id.* at 13. According to Rahming, O'Hern has received appropriate treatment for pain associated with his avascular necrosis. *Id.* Rahming avers that Ultram is meant for short-term pain relief and not for patients suffering long-term chronic pain issues like O'Hern, but "O'Hern threatened litigation due to his disagreement over the Ultram prescription." *Id.* at 13-14.

In 2015, O'Hern has been treated for, among other things, his hip pain. *Id.* at 14. In April 2015, he was fitted for replacement shoes. *Id.* at 14-15. Rahming avers that O'Hern has been seen and treated frequently and appropriately according to medical standards. *Id.* at 15.

Defendant Diaz avers that she did not provide O'Hern medical treatment. *Diaz Aff. - Doc. No. 15-6* at 2. She states she responded to his medical grievances, and in her medical opinion, O'Hern received appropriate medical care. *Id.* at 3.

Defendant Doshi avers that O'Hern's "chronic joint changes and limb shortening has been adequately managed through non-steroidal anti-inflammatory medications and Ultram with corrective shoes to compensate for limb length discrepancy." *Doshi Suppl. Aff. - Doc. No. 29-1* at 4. Doshi further states O'Hern "has profiles for a long cane, no prolonged standing or walking, as well as a bottom bunk profile to help manage his symptoms," and according to an orthopedist and O'Hern, "surgery was to be avoided as much as possible." *Id.* Doshi avers that using the wheelchair is O'Hern's best option. She states, "Use of the wheelchair, rather than total hip replacement, would be the best medical option for Mr.

15

O'Hern due to the fact that Mr. O'Hern's previous fracture affected the subject joint, causing significant osteoarthritis and remodeling of the joint and limb length discrepancy that required corrective shoes." *Id.* at 4-5. In her opinion, O'Hern "is not an ideal candidate for hip replacement surgery at this juncture and conservative treatment is a better medical option for Mr. O'Hern." *Id.* at 5.

### III. DISCUSSION

O'Hern asserts that defendants were deliberately indifferent to his serious medical hip ailment. Defendants deny they acted with deliberate indifference to O'Hern's medical needs, and they each deny their actions constituted malpractice. Instead, they maintain that O'Hern received appropriate treatment for his conditions.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that a defendant acted with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment.").

16

That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105-07 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833-38 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir.1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n.28 (11th Cir.1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999), revised 205 F.3d 1264 (11th Cir. 2000) (noting privately employed prison physician ineligible for qualified immunity).

In order to properly establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." *Taylor*, 221

17

F.3d at 1258; *McElligott* v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105; *Mandel [v. Doe],* 888 F.2d [783,] 787 [11[th] Cir. 1989]. Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers,* 792 F.2d at 1058 (citation omitted). Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice "not sufficient" to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11ᵗʰ Cir. 1991) (alterations added); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that the defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, the question of whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7ᵗʰ Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11ᵗʰ Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution).

O'Hern has a serious hip ailment, but Defendant Doshi relatively promptly and consistently treated him for it. Likewise, Defendant Diaz did not ignore O'Hern's grievances or his concerns. The undisputed medical records demonstrate that correctional medical personnel examined O'Hern when he submitted a sick call request regarding his hip pain and other health concerns. He was seen regularly for chronic health issues, and he has received several orthopedic evaluations since he injured his hip and leg. He was prescribed various medications, and he received assistive devices. Doctors and medical personnel conferred to

determine his best plan of care, and he was provided continuous access to health care providers in an effort to monitor his condition. The persons who took over O'Hern's medical care after defendants treated him exercised their medical judgment and came to the same conclusions. Based on the statements received from the medical defendants, in accordance with their medical experience and professional judgment, they did not deem it necessary to order a hip replacement or further referral to a specialist. The medical care O'Hern received was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505 (quotation marks and citation omitted). That O'Hern desired a different mode of treatment does not amount to deliberate indifference. *Hamm*, 774 F.2d 1567, 1575 (11th Cir. 1985) (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment). Whether correctional medical personnel "should have employed additional . . . forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545-46 (quoting *Estelle*, 429 U.S. at 107); *see also Adams*, 61 F.3d at 1546 (inmate's allegation that his prison physician did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference") (citations omitted). The mere fact that prison medical personnel or O'Hern's physician before he entered prison differed in their

opinions as to the appropriate course of treatment for O'Hern does not, without more, constitute deliberate indifference. *See Garvin*, 236 F.3d at 898.

Finally, any claim that specific medical procedures have been impermissibly delayed requires an inmate to put verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment. *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Here, the court finds that no verifying evidence has been produced by O'Hern tending to establish any detrimental effect as a result of the medical defendants' actions or that they in any way disregarded a substantial risk to Plaintiff's health by delaying medical services or medical care for him. *See generally Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003). It is undisputed that O'Hern received continuous medical care for his conditions. It is likewise evident that the medical defendants rendered treatment to O'Hern in accordance with their professional judgment. In addition, O'Hern has failed to present any evidence which indicates that the medical officials knew that the manner in which they provided treatment created a substantial risk to O'Hern's health and that with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence, significantly probative or otherwise, showing that medical officials acted with deliberate indifference to O'Hern's medical needs. Consequently, summary judgment is due to be granted in favor of defendants. *Taylor*, 221 F.3d at 1258.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  The federal claims be dismissed with prejudice.

4.   The state law medical malpractice claims be dismissed without prejudice.[5]

5.  Costs be taxed against the plaintiff.

It is further

ORDERED that on or before **August 24, 2015,** the parties may file objections to the Recommendation.   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from

---

[5]To the extent O'Hern may be raising supplemental state law claims, the court in its discretion declines to consider them, and they should be dismissed without prejudice. 28 U.S.C. § 1367(c)(3).  *See also Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988) ("when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain,[] the federal court should decline the exercise of jurisdiction by dismissing the [claim] without prejudice") (footnote omitted).

attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 10th day of August, 2015.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE